

$350.00

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF PENNSYLVANIA

| | |
|---|---|
| ROBIN FEEKO, 8 Locust Drive, Malvern, PA 19355, <br><br> NELIDA MARENGO, 40 Foremost Mountain Road, Montville, NJ 07045, <br><br> and JANET RODGERS, 219 Williams Road, Rosemont, PA 19010, <br><br> on behalf of themselves, Individually and on Behalf of All Others Similarly Situated, <br><br>        Plaintiffs, <br><br>    v. <br><br> PFIZER, INC., 235 East 42nd Street, New York, NY 10017 <br><br> and WYETH SPECIAL TRANSACTION SEVERANCE PLAN, 235 East 42nd Street, New York, NY 10017 <br><br>        Defendants. | Civil Action No. <br><br> **COMPLAINT**   **11**    **4296** <br> **(CLASS ACTION)** <br><br>  |

Plaintiffs, Robin Feeko, Nelida Marengo, and Janet Rodgers, by and through their

counsel, allege as follows:

### NATURE OF THE ACTION

1.     This is a civil enforcement action under the Employee Retirement Income

Security Act of 1974, as amended ("ERISA"), 29 U.S.C. § 1001, *et seq.*, by Plaintiffs, on behalf

of themselves and the Class, who are eligible participants in the Wyeth Special Transaction

Severance Plan (the "Severance Plan"), adopted and effective January 14, 2009. Pursuant to

ERISA § 502(a)(1)(B), 29 U.S.C.§ 1132(a)(1)(B), Plaintiffs seek to recover, both for themselves

and each member of the Class, with interest, the severance benefits, including, but not limited to

salary continuation benefits, certain welfare benefits, and the Rule of 70 benefits (the "Severance Benefits") to which they are entitled under the terms of the Plan and which the Administrative Committee of Pfizer (the "Administrative Committee") wrongfully denied them.

2.      In 2008, Pfizer targeted Wyeth for acquisition. On January 14, 2009, Wyeth adopted the Severance Plan to provide Wyeth employees with Severance Benefits if their employment was terminated within twenty-four (24) months of any "Change in Control" of the company. Under the terms of the Severance Plan, if an eligible participant experiences a termination of employment with the Company during the Change in Control period for any reason other than retirement or good cause, the employee is entitled to receive Change in Control Severance Benefits unless the employee is transferred to a "successor company of the Company or (any of its affiliates)."

3.      Pfizer acquired Wyeth on October 15, 2009, which constituted a Change of Control under the terms of the Plan. Plaintiffs were Wyeth employees who became Pfizer employees at the time of the acquisition. Plaintiffs worked in the Benchmark Federal Credit Union ("Benchmark"), a federally chartered credit union and a separate legal entity from Pfizer, but were on the Pfizer payroll and participated in Pfizer's employee benefit plans. On March 31, 2010, within twenty four months of the Change of Control, Pfizer terminated Plaintiffs' employment. Subsequently, on April 1, 2010, Plaintiffs were hired by Benchmark.

4.      Plaintiffs filed claims for Severance Benefits, but the Plan's Administrative Committee denied their claims on the grounds that their employment was transferred to Benchmark and that Benchmark is a "successor employer" and a "successor to Pfizer with respect to the outsourcing of its credit union work."

5.     Plaintiffs allege that the Administrative Committee abused its discretion in denying their claim for Severance Benefits by failing to determine eligibility for benefits in accordance with the provisions of the Severance Plan and by failing to construe in good faith the terms of the Severance Plan.  The Severance Plan does not exclude from eligibility employees who are transferred to a "successor employer" but instead excludes employees who are transferred to a "successor company of the Company."  Benchmark is not a "successor company" to Pfizer.  Plaintiffs respectfully ask the Court, *inter alia*, (1) to certify this case as a class action, and (2) to declare that the Plaintiffs and the Class are entitled to receive Severance Benefits.

## JURISDICTION AND VENUE

6.     This Court has subject matter jurisdiction over this action by virtue of 28 U.S.C. § 1331, because this is a civil action arising under the laws of the United States.  Specifically, this action is brought under ERISA § 502(a)(1)(B),  29 U.S.C. § 1132(a)(1)(B).

7.     This Court has personal jurisdiction over the Defendants because they transact business in, and/or have significant contacts with, this District, and because ERISA provides for nationwide service of process.  *See* ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2).

8.     Venue is proper in this District under ERISA § 502(e), 29 U.S.C. § 1132(e), for at least the following reasons: (a)  the alleged breaches took place in this District because Plaintiffs Feeko and Rodgers and the majority of Class members who were denied the benefits sought through this action should have received those benefits in this District, and/or (b) Defendants may be found in this District and/or have significant contacts with this District because Pfizer has facilities in this District and the Plan covers participants in this District.

## PARTIES

9.      Plaintiff Robin F. Feeko ("Feeko) is a former employee of Wyeth and Pfizer and was, at all relevant times, a participant in the Severance Plan as the term "participant" is defined in ERISA Section 3(7), 29 U.S.C. § 1002(7).  Plaintiff Feeko's employment was terminated by Pfizer on March 31, 2010.  On April 1, 2010, she began employment with Benchmark.

10.     Plaintiff Nelida Marengo ("Marengo") is a former employee of Wyeth and Pfizer and was, at all relevant times, a participant in the Severance Plan as the term "participant" is defined in ERISA § 3(7), 29 U.S.C. § 1002(7).   Plaintiff Marengo's employment with Pfizer was terminated on March 31, 2010.  On April 1, 2010, she began employment with Benchmark.

11.     Plaintiff Janet Rodgers ("Rodgers") is a former employee of Wyeth and Pfizer and was, at all relevant times, a participant in the Severance Plan as the term "participant" is defined in ERISA § 3(7), 29 U.S.C. § 1002(7).  Plaintiff Rodgers' employment was terminated by Pfizer on March 31, 2010.  On April 1, 2010, she began employment with Benchmark.

12.     Defendant Wyeth Special Transaction Severance Plan, restated effective January 14, 2009, is an "employee welfare benefit plan" within the meaning of ERISA § (3)(1), 29 U.S.C. §1002(1).  The Severance Plan was established by Wyeth for its employees.  Wyeth was succeeded by Pfizer as the Plan sponsor when Pfizer acquired Wyeth on October 15, 2009.

13.     Pfizer, Inc. is publically traded and one of the world's largest biopharmaceutical companies.  Pfizer was incorporated in Delaware in 1942, is headquartered in New York, New York, and has facilities in Eastern Pennsylvania.  On October 15, 2009, Pfizer acquired Wyeth in a $68 billion cash and stock transaction and became the sponsor of the Severance Plan.  Benefits under the Plan are paid directly out of Pfizer's assets.

## RELEVANT NON-PARTIES

14.     Benchmark Federal Credit Union, formerly Wybro Credit Union, was federally chartered by the United States in 1940 and is, and always has been, owned and controlled by its members. Benchmark's main office is located at 1522 McDaniel Drive, West Chester, PA 19380.

## CLASS ACTION ALLEGATIONS

15.     Plaintiffs bring the action as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure on behalf of the following class:

> Participants in the Severance Plan, who, as employees of the Company (Wyeth, and subsequently Pfizer), provided services to the Benchmark Federal Credit union, experienced an Involuntary Termination of Employment by the Company on March 31, 2010, and following their Involuntary Termination of Employment, were hired by Benchmark Federal Credit Union and not provided with Change in Control Severance Benefits under the Severance Plan.

### Numerosity

16.     On information and belief, the members of the Class are so numerous that joinder of all members is impracticable. Plaintiffs believe that the Class includes approximately 40 members and their beneficiaries.

### Commonality

17.     The claims in this case raise numerous questions of fact and law that are and will be common to all members of the Class including the following: (a) The issues of liability are common to all members of the Class as those issues concern the interpretation of the provisions of the Severance Plan that apply to all members of the Class, and (b) The issues regarding the relief are also common to the members of the Class as the amount of relief will be based on benefits calculated in conformity with the proper interpretation of the Plan and ERISA.

**Typicality**

18.     Plaintiffs' claims are typical of the claims of Class members, and therefore satisfy the requirements of Fed. R. Civ. P. 23(a)(3). Plaintiffs do not assert any claims relating to the Severance Plan in addition to or different than those of the Class.

**Adequacy**

19.     Plaintiffs will fairly and adequately represent and protect the interests of the members of the Class because Plaintiffs have no interests antagonistic to or in conflict with the interests of the Class and because Defendants have no unique defenses against the Plaintiffs that would interfere with Plaintiffs' representation of the Class.

**Rule 23(b)(1)(A):**

20.     Rule 23(b)(1)(A): The requirements of Fed. R. Civ. P. 23(b)(1)(A) are also satisfied because the Plan Administrator has a legal obligation to interpret the terms of the Plan consistently for all similarly situated participants. As one of the primary issues in this case involves the interpretation of the terms of the Severance Plan, conflicting interpretations of the same Plan as to similarly situated participants creates the risk of establishing incompatible standards of conduct for the Plan and its administrator.

**Rule 23(b)(1)(B):**

21.     The requirements of Fed. R. Civ. P. 23(b)(1)(B) are satisfied because the primary issues in this case involve questions concerning the interpretation of the terms of the Severance Plan. As the Plan Administrator must interpret the Severance Plan consistently as to all similarly situated participants, resolution of this question in this litigation, as a practical matter, would be dispositive of the interests of the other members of the Class or substantially impair or impede their ability to protect their interests.

**Rule 23(b)(2):**

22.    The requirements of Fed. R. Civ. P. 23(b)(2) are met in this action because the

Plan Administrator is required to interpret the Severance Plan consistently as to similarly situated

participants, and as a result, the Severance Plan's actions affected all Class members in the same

manner making appropriate final declaratory and injunctive relief with respect to the Class as a

whole.

**Rule 23(b)(3):**

23.    Alternatively, the requirements of Fed. R. Civ. P. 23(b)(3) are met in this action

because (a) the questions of law and/or fact, including the proper interpretation of the terms of

the Severance Plan, are not only common, but will predominate over any individual questions

and (b) a class action is superior to other available methods for the fair and efficient adjudication

of this litigation.

## STATEMENT OF FACTS

**Merger of Wyeth and Pfizer**

24.    In 2008, Pfizer targeted Wyeth for acquisition due to the looming loss of patents

on its most lucrative products and declining company revenue projections.  According to a

Bloomberg article entitled Pfizer's $68 Billion Wyeth Deal Eases Lipitor Loss, dated January 26,

2009, Pfizer was interested in purchasing Wyeth to "offset some of the $12 billion in sales it

begins losing in 2011 when Lipitor, which generates a quarter of the company's revenue, gets

generic competition."  According to this Bloomberg article, although the merger between Wyeth

and Pfizer would "keep Pfizer's earnings unchanged when patents expire, it creates a

pharmaceutical behemoth that will be very difficult to grow" and that "Pfizer would need to cut

70 percent of Wyeth's research, marketing, and administrative costs."

25.     On October 15, 2009, Pfizer completed the purchase of Wyeth in a $68 billion cash and stock transaction.

**The Severance Plan**

26.     The Wyeth Special Transaction Severance Plan was adopted and became effective on January 14, 2009 upon approval by Wyeth's Board of Directors and the Compensation and Benefits Committee of Wyeth.

27.     The purpose of the Severance Plan is to "provide certain employees in the United States and Puerto Rico with benefits that will assist them with their transition during and following a Change in Control." Severance Plan at Purpose of the Plan.

28.     Under the Severance Plan, participants are eligible for benefits that consist of a cash payment ("Salary Continuation Benefits"), welfare benefits, and the Rule of 70 benefit, as applicable.

29.     The Salary Continuation Benefits are calculated by continuing the severed participant's salary for the longest period calculated by the following formulas: 1) the sum of two-weeks for each year of eligible service *plus* one-week for each $10,000 in salary the participant earned at the time of termination (not to exceed 12 additional weeks); or 2) 26 weeks of salary (for employees who earn a salary of less than $200,000); or 3) 52 weeks of salary (for employees who earn a salary of more than or equal to $200,000). The number of weeks used to calculate the amount of Salary Continuation Benefits for the applicable employee constitutes such employee's applicable "Benefit Continuation Period." Severance Plan at § 4.2(a).

30.     During the Benefit Continuation Period, an employee is also entitled to receive continued coverage of certain welfare benefits that the employee had at the time of the employee's termination. Severance Plan at § 5.1.

31.     Additionally, eligible participants in the Severance Plan who also met the
eligibility requirements of the Wyeth Retirement Plan qualify for the Rule of 70 benefit.
Severance Plan at § 5.3. The Rule of 70 benefit is an early retirement subsidy provided under the
Wyeth Retirement Plan, as amended on December 22, 2008, that is available to an employee
who meets the eligibility requirements of the Retirement Plan and the Severance Plan, and who
has a combined age and years of vesting service equal to or in excess of 70.

32.     The acquisition of Wyeth by Pfizer commenced the twenty-four (24) month
Change in Control period. According to the terms of the Severance Plan, a Change in Control
occurs when, among other things, "any person or persons acting in concert ... becomes the
beneficial owner of securities of the Company having at least 20% of the voting power of the
Company's then outstanding securities." Severance Plan at § 1.5.

33.     Under the terms of the Severance Plan, if an eligible participant experiences a
termination of employment with the Company during the Change in Control period for any
reason other than retirement or good cause ("Involuntary Termination of Employment"), the
employee is entitled to receive Change in Control Severance Benefits provided that a
participant's employment is not transferred to a "successor company of the Company or (any of
its affiliates)." Severance Plan at § 1.19.

34.     Section 2.2 of the Severance Plan gives the Plan Administrator full discretion to
determine eligibility to receive benefits under the Plan. Section 1.13 states that "Plan
Administrator" means the Human Resources, Benefits and Compensation Committee (or its
successor) of the Company." After Pfizer acquired Wyeth, the Pfizer Administrative Committee
became the successor to the Wyeth Human Resources, Benefits and Compensation Committee.

35.    After Pfizer acquired Wyeth, Pfizer assumed the obligations of the Severance

Plan. Benefit payments are made out of Pfizer's general assets.

**Termination of Pfizer's Benchmark Employees**

36.    On March 10, 2010, Pfizer employees who worked at all Benchmark branches

(Collegeville, Great Valley, Madison, Princeton, Richmond, and West Chester) participated in a

teleconference with two Pfizer Human Resources representatives and David La Sala, the CEO of

Benchmark. On this conference call, the Pfizer employees who worked at Benchmark were

informed that, as of April 1, 2010, they would no longer be employed by Pfizer, but instead

would be employed by Benchmark.

37.    Additionally, on this March 10, 2010 conference call, the Pfizer employees who

worked at Benchmark were informed that they would not be eligible for Severance Benefits as

their employment by Pfizer would not be terminated, but instead transferred to Benchmark.

38.    Following the March 10, 2010 conference call, Pfizer's employees who worked at

Benchmark were distributed a document entitled "Frequently Asked Questions." This document

stated that these Pfizer employees would "officially" become "employee[s] of Benchmark

effective as April 1, 2010."

39.    Although Pfizer stated that the employees who worked at Benchmark would be

transferred to Benchmark, they were required to apply for jobs at Benchmark. On or about

March 17, 2010, Pfizer employees who worked at Benchmark were sent a memo from Pamela A.

McCourt requesting personnel information in "preparation for the process of setting up all

personnel records and payroll for Benchmark Federal Credit Union." Pfizer employees who

worked at Benchmark were distributed a "Benchmark application form" for completion and

submission. In completing the "Benchmark application form," the employees signed an

Applicant's Statement stating that they "authorize investigation of all statements contained in

this application for employment as may be necessary in arriving at an employment decision." Additionally, this Applicant's Statement stated that the applicant, "in the event of employment" is "required to abide by all rules and regulations of the employer."

40.     On March 31, 2010, the employment of Pfizer employees who worked at Benchmark was terminated by Pfizer. On April 1, 2010, the former employees of Pfizer who worked at Benchmark become employees of Benchmark. From this point onward, Plaintiffs and the Class were paid directly by Benchmark, all employee benefits were provided by Benchmark, and all employment personnel decisions were made by Benchmark.

**Benchmark Federal Credit Union**

41.     Benchmark was chartered by the United States government in 1940 and is a cooperative financial institution owned and operated by its members. According to its bylaws, Benchmark's Board of Directors and committee were comprised of individual Benchmark members. All of Benchmark's profits are returned to its members.

42.     Neither Wyeth nor Pfizer has or ever had a financial interest, equity stake, or any other interest in Benchmark. The operations of Benchmark have at all times been controlled by its members and neither Wyeth nor Pfizer have ever reported Benchmark as part of their corporate structures.

43.     Benchmark is not a successor company either to Wyeth or Pfizer.

### EXHAUSTION OF REMEDIES

44.     According to the Severance Plan, the "Company will notify an Employee at the time of Termination of Employment, what benefits, if any, the Employee will receive under the Plan." Severance Plan at ¶ 7.5(a). In a March 10, 2010 conference call, Pfizer informed Pfizer employees who worked at Benchmark that they would not be eligible for Severance Benefits as their employment by Pfizer would not be terminated, but instead transferred to Benchmark.

**Plaintiff Robin Feeko**

45.     On May 26, 2010, Plaintiff Feeko submitted a benefit claim to the Human
Resources, Benefits and Compensation Committee of Wyeth as well as the Legacy Wyeth
Benefits Administrator seeking Severance Benefits.  Plaintiff Feeko requested that she be paid
severance benefits under the Severance Plan because she had been terminated from Pfizer, was
no longer an employee of Pfizer or one of its affiliates, and had since become an employee of
Benchmark, which is unaffiliated with Pfizer.  Plaintiff Feeko requested that her claim letter be
forwarded to the appropriate person or committee if it had not been addressed to the appropriate
entity.

46.     By letter dated August 27, 2010, Kim Walker, Coordinating Office of Pfizer,
denied Plaintiff Feeko's claim on the grounds that Feeko did not meet the eligibility criteria set
forth in the Severance Plan.  Ms. Walker stated that (a) Plaintiff Feeko's employment had been
transferred to a "successor employer," Benchmark Federal Credit Union, (b) Plaintiff Feeko had
not experienced an employment loss and had remained employed with Benchmark since the date
of transfer, and (c) Plaintiff Feeko had not experienced a reduction in the base rate of pay nor
had her principal place of business been changed.  Ms. Walker informed Plaintiff Feeko that she
had the right to appeal the determination to the Administrative Committee.

47.     By letter dated October 26, 2010, Plaintiff Feeko appealed the denial of her
benefit claim to the Administrative Committee.  In the October 25, 2010 letter, Plaintiff Feeko
asserted the following:  (a) she had not been "transferred" from Pfizer to Benchmark because she
was required to submit an application for employment with Benchmark; (b) Benchmark was not
an affiliate or successor company of Pfizer, but was an independent credit union chartered by the
U.S. government and owned and controlled by its members; (c) the letter denying her claim was

based on a misreading of the Severance Plan document which provided that Severance Benefits were available unless the employee was transferred to a "successor **company**" while the benefit denial letter incorrectly stated that benefits were not available if the employee was transferred to a "successor **employer**," and (d) the fact that she obtained employment after being terminated by Pfizer did not disqualify her for Severance Benefits.

48.   By letter dated December 16, 2010, the Administrative Committee denied Plaintiff Feeko's appeal, finding that she had not experienced a "Termination of Employment" under the Plan because: (a) "Benchmark is a successor to Pfizer with respect to the outsourcing of its credit union work and, under the terms of the Employment Continuity Agreement, maintained continuous employment for you with the same terms and conditions as you had at Pfizer;" (b) the terms and conditions of employment included the same severance opportunity as Feeko had at Pfizer; and (c) this interpretation of the Plan is consistent with Wyeth's past practices going back to Project Impact "where Wyeth denied severance to employees transferred to another entity as a result of a sale if, like here, the entity to which employees were transferred provided services back to Wyeth." Feeko was informed that the Administrative Committee's decision was the final determination on review and that Feeko had the right to challenge the adverse determination by bringing a civil action under Section 502(a) of ERISA.

49.   The December 16, 2010 appeal denial letter did not provide any factual detail concerning the Project Impact benefit denial nor did it state the terms of the Severance Plan in effect for Project Impact workers. By letter dated April 4, 2011 to the Administrative Committee, Feeko requested all documents and records that related to her claim. Feeko was provided with documents in response, but those documents did not include any information relating to Project Impact or the severance plan in effect at the time of Project Impact.

50.    Plaintiff Feeko has exhausted all administrative remedies available to her.

**Plaintiff Nelida Marengo**

51.    On May 24, 2010, Plaintiff Marengo submitted a benefit claim to the Human Resources, Benefits and Compensation Committee of Wyeth as well as the Legacy Wyeth Benefits Administrator seeking Severance Benefits.  Plaintiff Marengo requested that she be paid severance benefits under the Severance Plan because she had been terminated from Pfizer, was no longer an employee of Pfizer or one of its affiliates, and had since become an employee of Benchmark, which is unaffiliated with Pfizer.  Plaintiff Marengo requested that her claim letter be forwarded to the appropriate person or committee if it had not been addressed to the appropriate entity.

52.    By letter dated August 27, 2010, Kim Walker, Coordinating Office of Pfizer, denied Plaintiff Marengo's claim on the grounds that Marengo did not meet the eligibility criteria set forth in the Severance Plan.  Ms. Walker stated that (a) Plaintiff Marengo's employment had been transferred to a "successor employer," Benchmark Federal Credit Union, (b) Plaintiff Marengo had not experienced an employment loss and had remained employed with Benchmark since the date of transfer, and (c) Plaintiff Marengo had not experienced a reduction in the base rate of pay nor had her principal place of business been changed.  Ms. Walker informed Plaintiff Marengo that she had the right to appeal the determination to the Administrative Committee.

53.    By letter dated October 26, 2010, Plaintiff Marengo appealed the denial of her benefit claim to the Administrative Committee.  In the October 26, 2010 letter, Plaintiff Marengo asserted the following:  (a) she had not been "transferred" from Pfizer to Benchmark because she was required to submit an application for employment with Benchmark; (b) Benchmark was not an affiliate or successor company of Pfizer, but was an independent credit union chartered by the

U.S. government and owned and controlled by its members; (c) the letter denying her claim was based on a misreading of the Severance Plan document which provided that Severance Benefits were available unless the employee was transferred to a "successor **company**" while the benefit denial letter incorrectly stated that benefits were not available if the employee was transferred to a "successor **employer**," and (d) the fact that she obtained employment after being terminated by Pfizer did not disqualify her for Severance Benefits.

54.     By letter dated December 16, 2010, the Administrative Committee denied Plaintiff Marengo's appeal, finding that she had not experience a Termination of Employment" under the Plan because, among other things: (a) "Benchmark is a successor to Pfizer with respect to the outsourcing of its credit union work and, under the terms of the Employment Continuity Agreement, maintained continuous employment for you with the same terms and conditions as you had at Pfizer;" (b) the terms and conditions of employment included the same severance opportunity as Marengo had at Pfizer; and (c) this interpretation of the Plan is consistent with Wyeth's past practices going back to Project Impact "where Wyeth denied severance to employees transferred to another entity as a result of a sale if, like here, the entity to which employees were transferred provided services back to Wyeth." Marengo was informed that the Administrative Committee's decision was the final determination on review and that Marengo had the right to challenge the adverse determination by bringing a civil action under Section 502(a) of ERISA.

55.     The December 16, 2010 appeal denial letter did not provide any factual detail concerning the Project Impact benefit denial nor did it state the terms of the severance plan in effect for Project Impact workers. By letter dated March 31, 2011 to the Administrative Committee, Marengo requested all documents and records that related to her claim. Marengo

was provided with documents in response, but those documents did not include any information

relating to Project Impact or the severance plan in effect at the time of Project Impact.

    56.    Plaintiff Marengo has exhausted all administrative remedies available to her.

**Plaintiff Janet Rodgers**

    57.    By letter dated May 26, 2010, to the Legacy Wyeth-Benefits Administrator and

the Human Resources, Benefits and Compensation Committee of Wyeth, Plaintiff Janet Rodgers

("Rodgers") requested that she be paid severance benefits under the Severance Plan because she

had been terminated from Pfizer, was no longer an employee of Pfizer or one of its affiliates, and

had since become an employee of Benchmark, which is unaffiliated with Pfizer. Plaintiff

Rodgers requested that her claim letter be forwarded to the appropriate person or committee if it

had not been addressed to the appropriate entity.

    58.    By letter dated August 27, 2010, Kim Walker, Coordinating Office of Pfizer,

denied Plaintiff Rodgers' claim on the grounds that Rodgers did not meet the eligibility criteria

set forth in the Severance Plan. Ms. Walker stated that (a) Plaintiff Rodgers' employment had

been transferred to a "successor employer," Benchmark Federal Credit Union, (b) Plaintiff

Rodgers had not experienced an employment loss and had remained employed with Benchmark

since the date of transfer, and (c) Plaintiff Rodgers had not experienced a reduction in the base

rate of pay nor had her principal place of business been changed. Ms. Walker informed Plaintiff

Rodgers that she had the right to appeal the determination to the Administrative Committee.

    59.    By letter dated October 25, 2010, Plaintiff Rodgers appealed the denial of her

benefit claim to the Administrative Committee. In the October 25, 2010 letter, Plaintiff Rodgers

asserted the following: (a) she had not been "transferred" from Pfizer to Benchmark because she

was required to submit an application for employment with Benchmark; (b) Benchmark was not

an affiliate or successor company of Pfizer, but was an independent credit union chartered by the U.S. government and owned and controlled by its members; (c) the letter denying her claim was based on a misreading of the Severance Plan document which provided that Severance Benefits were available unless the employee was transferred to a "successor **company**" while the benefit denial letter incorrectly stated that benefits were not available if the employee was transferred to a "successor **employer**," and (d) the fact that she obtained employment after being terminated by Pfizer did not disqualify her for Severance Benefits.

60.     By letter dated December 16, 2010, the Administrative Committee denied Plaintiff Rodgers' appeal, finding that she had not experience a Termination of Employment" under the Plan because: (a) "Benchmark is a successor to Pfizer with respect to the outsourcing of its credit union work and, under the terms of the Employment Continuity Agreement, maintained continuous employment for you with the same terms and conditions as you had at Pfizer;" (b) the terms and conditions of employment included the same severance opportunity as Rodgers had at Pfizer; and (c) this interpretation of the Plan is consistent with Wyeth's past practices going back to Project Impact "where Wyeth denied severance to employees transferred to another entity as a result of a sale if, like here, the entity to which employees were transferred provided services back to Wyeth." Rodgers was informed that the Administrative Committee's decision was the final determination on review and that Rodgers had the right to challenge the adverse determination by bringing a civil action under Section 502(a) of ERISA.

61.     The December 16, 2010 appeal denial letter did not provide any factual detail concerning the Project Impact benefit denial nor did it state the terms of the Severance Plan in effect for Project Impact workers. By letter dated April 4, 2011 to the Administrative Committee, Rodgers requested all documents and records that related to her claim. Rodgers was

provided with documents in response, but those documents did not include any information relating to Project Impact or the severance plan in effect at the time of Project Impact.

62.     Plaintiff Rodgers has exhausted all administrative remedies available to her.

## COUNT I

63.     Plaintiffs repeat and re-allege the allegations contained in all foregoing paragraphs herein.

**Plaintiffs are entitled to Severance Benefits**

64.     ERISA § 502(a)(1)(B), 29 U.S.C. § 1132(a)(1)(B), provides that a participant may bring a civil action "to recover benefits due to him under the terms of his plan, to enforce his rights under the terms of the plan, or to clarify his rights to future benefits under the term if the plan."

65.     Pursuant to the terms of the Severance Plan, a participant whose employment is involuntarily terminated by Pfizer at any time during the Change in Control Period (October 15, 2009 though October 15, 2011) is entitled to Severance Benefits unless his employment is transferred to "any successor company of the Company or any of its affiliates."

66.     The Plan effectively defines "successor company" in Article VIII, Section 8.3 where it states: "The obligations of the Company under the Plan shall be binding upon any organization which shall succeed to all or substantially all of the assets of the Company or otherwise be a successor of the Company by operation of law . . . . and the term 'Company,' whenever used by the Plan, shall mean and include any such organization after the succession." After Pfizer purchased all or substantially all of the assets of Wyeth, Pfizer became the successor to Wyeth and assumed the obligation of the Plan.

67.     On March 31, 2010, Plaintiffs and the Class experienced an Involuntary Termination of Employment by Pfizer.  Plaintiffs and the Class were required to apply for jobs at Benchmark and began working at Benchmark on April 1, 2010.

68.     Benchmark is not a successor company of the Company or one of its affiliates, but is instead a federally chartered credit union that is and has been owned and operated by its members since 1940.  Benchmark has not succeeded to all or substantially all of the assets of Pfizer nor is it a successor of Pfizer by operation of law.  Although the appeal denial letter stated that "Benchmark is the successor to Pfizer with respect to the outsourcing of its credit union work," Benchmark was never part of Wyeth or Pfizer nor did Wyeth or Pfizer ever engage in credit union work.  Consequently, Benchmark is not and cannot be a "successor company" to Pfizer.

69.     Plaintiffs therefore meet the requirements in the Severance Plan to receive Severance Benefits, which include Salary Continuation Benefits, certain Welfare Benefits, and the Rule of 70 benefits, as applicable.

**The Administrative Committee operated under a conflict of interest.**

70.     The Administrative Committee, the designated appeal committee for the Severance Plan, is composed of Pfizer employees.

71.     Any payments made pursuant to the Severance Plan comes from Pfizer's corporate assets.

72.     The Administrative Committee operated under a structural conflict of interest when it made Plaintiffs' final appeal decisions, which must be weighed in determining the extent of any deference its benefits decisions are due.

**The Administrative Committee abused its discretion because it based the claims denial on terms that were not in the Plan.**

73.     Both the Coordinating Office and the Pfizer Administrative Committee denied Plaintiffs' Severance Benefits on the grounds that their employment was transferred to a "successor **employer**" even though the Severance Plan provisions cited by both does not exclude employees from eligibility if they transfer to a "successor employer" but instead excludes them if they transfer to a "successor company of the Company."

74.     Although the Plaintiffs in their appeal letters to the Administrative Committee each stated that the Coordinating Office incorrectly based its decisions on the term "successor employee" rather than "successor company of the Company," the Administrative Committee did not address the argument and simply repeated the Coordinating Office's error by holding that the Plaintiffs were transferred to a "successor employer" without any explanation for the Committee's departure from the Plan language.

75.     Neither the Coordinating Office nor the Administrative Committee cited to any provision of the Severance Plan excluding employees who had been transferred to a "successor employer." "Successor employer" is not defined in the Severance Plan nor is that term mentioned anywhere in the Severance Plan. Moreover, the Severance Plan does not state that employees are ineligible for Severance Benefits if they subsequently become employed, even if that employment is arranged by Pfizer.

76.     The Administrative Committee's interpretation of the Plan is not only inconsistent with its language, but also inconsistent with Wyeth's interpretation of the Plan, as Plan Administrator, prior to Pfizer's purchase of Wyeth when, in a communication entitled "Questions and Answers for Non-Union U.S. and Puerto Rico Employees," last updated on September 24, 2009, Wyeth stated:

Case 2:11-cv-04296-NS   Document 1   Filed 07/01/11   Page 21 of 25

**If I obtain employment outside of Wyeth/Pfizer during the salary continuation period, am I still eligible for salary continuation payments and/or benefits during this period?**

Yes, you will continue to receive your salary continuation, unless you are rehired by Wyeth/Pfizer. However, if you secure welfare benefits (medical and prescription drug, dental and vision coverage and basic life insurance) from another employer, your welfare benefit continuation coverage under the Special Transaction Severance Plan will end.

77.     The Administrative Committee acted arbitrarily and capriciously by basing its decisions on the fact that Plaintiffs' employment was transferred to a "successor employer" when those terms are not in the Plan document.

**The Administrative Committee abused its discretion by relying on previous Wyeth benefit denials under a different plan and under different circumstances.**

78.     The Administrative Committee asserted in its appeal denial letter that its interpretation of the Plan's successor provision is consistent with Wyeth's past practices "going back to Project Impact where Wyeth denied severance to employees transferred to another entity as a result of a sale, if, like here, the entity to which employees were transferred provided services back to Wyeth." It is apparent from the face of the appeal denial letter that the Plaintiffs' situation is not analogous to the situation described in the letter. The Plaintiffs were not transferred to Benchmark as a result of a sale and Benchmark does not provide services back either to Wyeth or Pfizer, but instead provides services to its members. Consequently, it was an abuse of discretion to deny Plaintiffs their Severance Benefits based on this analogy.

79.     Moreover, the appeal denial letter does not give any details identifying the Project Impact employees who were denied severance, the entity that was sold, the nature of the services provided back to Wyeth or the terms of the severance plan applicable to those employees. The appeal denial letter does not list any documents relating to Project Impact that were reviewed by the Administrative Committee and no documents relating to Project Impact were provided to the

- 21 -

Plaintiffs when they requested all documents relied upon by the Administrative Committee to make its decision.

80.     Project Impact was a Wyeth restructuring plan announced in January 2008, a year before the Wyeth Special Transaction Plan was created. *See* Wyeth's Q4 2007 Earnings Call Transcript. Because the Wyeth Special Transaction Plan does not apply to individuals other than those terminated as a result of a Change of Control, employees terminated as a result of Project Impact (even if they were terminated after the Special Transaction Plan came into existence) would not have been entitled to Severance Benefits under the Wyeth Special Transaction Plan. Because any employees who received severance benefits as a result of Project Impact would have received them pursuant to some other Wyeth severance plan, Wyeth's interpretation of that plan is irrelevant to the Severance Plan at issue here unless the language of the two plans is exactly the same.

81.     All Wyeth severance plans do not contain the same language that is in the Special Transition Severance Plan. For example, the Wyeth U.S. Transition Benefit Plan (established as of March 1, 2008) does not contain language which excludes from eligibility those whose employment is transferred to a "successor company." Instead, it excludes employees from eligibility if, among other things: (a) "The division of the Company you work for, or the Company itself, is sold or divested (regardless of the nature of the sale or divestiture);" and (b) "You are terminated as a result of the Company entering into an agreement to outsource a portion of the business which relates to your employment and you are offered employment in connection with the outsourcing." U.S. Transition Benefit Plan § 4.2. Any interpretations of the U.S. Transition Severance Plan would not be relevant to an interpretation of the Severance Plan

at issue here and the Administrative Committee abused its discretion by relying on such an interpretation.

**The Administrative Committee abused its discretion by failing to address Plaintiffs' arguments that they were terminated by Pfizer and hired by Benchmark rather than transferred to Benchmark.**

82.     In its claim denial letters, the Administrative Committee stated that the Plaintiffs claimed that they were entitled to benefits "based on the transfer of your employment from Pfizer to Benchmark Federal Credit Union ('Benchmark') pursuant to an Employment Continuity Agreement between Pfizer and Benchmark dated April 1, 2010." None of the Plaintiffs mentioned in their appeal letters the Employment Continuity Agreement nor did they claim that their employment was transferred. To the contrary, each of the Plaintiffs claimed that their employment with Pfizer had been terminated and that they had been required to apply for employment with Benchmark.

83.     The Administrative Committee abused its discretion mischaracterizing the Plaintiffs' claim and by failing to address Plaintiffs' arguments that their employment was not transferred because they had been required to apply for jobs at Benchmark.

**The Administrative Committee abused its discretion by relying on terms of the Employment Continuity Agreement dated April 1, 2010 to conclude that the Plaintiffs have "the same severance opportunity as [they] had should your employment with Benchmark terminate within a two-year period."**

84.     The Employment Continuity Agreement dated April 1, 2010 between Pfizer and Benchmark did not provide the newly hired Benchmark employees with the same severance opportunity that they had under the Severance Plan as the Administrative Committee alleged. Exhibit C to the Employment Continuity Agreement states that it sets forth select provisions of the Severance Plan that were to be applicable to the employees hired by Benchmark, but the terms of Exhibit C are different is several respects from those of the Severance Agreement.   For

example, Pfizer no longer has a responsibility to pay severance benefits, but instead those benefits are paid by Benchmark.

85.     Although Exhibit C purportedly gives newly hired Benchmark employees severance benefits, the employees have no rights to enforce the terms of the Employment Continuity Agreement. Section 4.9 of the Employment Continuity Agreement provides: "No Third Party Beneficiaries. This Agreement is for the sole benefit of the Parties and their assigns and nothing herein expressed or implied shall give or be construed to give to any person or entity, other than the Parties and such assigns, any legal or equitable rights hereunder."

86.     The Employment Continuity Agreement cannot be considered to be an amendment to the Severance Plan. Article VIII, Section 8.1(b) provides that the Severance Plan cannot be amended, modified or terminated after a Change in Control without the written consent of a majority of the affected employees.

87.     Although the Employment Continuity Agreement purportedly gave Plaintiffs and the proposed Class members severance rights, those rights were not the same rights that they had under the Severance Plan and the Administrative Committee abused its discretion by relying on the assumption that they were.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs pray this Court for:

1.     Benefits due under the terms of the Severance Plan;

2.     Attorney's fees pursuant to ERISA § 502(g);

3.     Interest;

4.     Costs, and;

5.     Such other relief as the Court deems appropriate.

Dated: July 1, 2011

By: _____

Marc I. Machiz
Attorney ID No. 92570
**COHEN MILSTEIN SELLERS**
**& TOLL, PLLC**
255 South 17th Street
Suite 1307
Philadelphia, PA  19103
Telephone:  (202) 408-4600
Facsimile:  (202) 408-4699

Karen L. Handorf
**COHEN MILSTEIN SELLERS**
**& TOLL, PLLC**
1100 New York Avenue, N.W.
Suite 500, West Tower
Washington, DC  20005
Telephone:  (202) 408-4600
Facsimile:  (202) 408-4699

***Attorneys for Plaintiffs***