# IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| ROBIN FEEKO; NELIDA MARENGO; and | : | |
| JANET RODGERS | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | NO. 11-4296 |
| PFIZER, INC. and WYETH SPECIAL | : | |
| TRANSACTION SEVERANCE PLAN | : | |

**NORMA L. SHAPIRO, J.**                              **NOVEMBER 18, 2014**

## MEMORANDUM

Plaintiffs Robin Feeko ("Feeko"), Nelida Marengo ("Marengo"), and Janet Rodgers ("Rodgers") filed this action on July 1, 2011, on behalf of themselves and all other similarly situated persons against defendants Pfizer, Inc. ("Pfizer") and the Wyeth Special Transaction Severance Plan to recover severance benefits for themselves and all members of the class, with interest, under the Employee Retirement Income Security Act of 1974 ("ERISA"), §502(a)(1)(B), as amended, 29 U.S.C. § 1132(a)(1)(B).  By memorandum and order of February 28, 2013, plaintiffs' motion for class certification and appointment of class counsel was denied for lack of numerosity.[1]  Plaintiffs filed a petition for permission to appeal the decision pursuant to Fed. R. Civ. P. 23(f); the U.S. Court of Appeals for the Third Circuit denied the petition on May 24, 2013.  Before the court are defendants' Motion for Judgment on the Administrative Record (paper no. 40) or, in the alternative, for Summary Judgment, and plaintiffs' Motion for Summary Judgment (paper no. 41).[2]  For the reasons stated herein, defendants' motion will be

---

[1]Except for the three above-named plaintiffs, the forty-two employees in the proposed class all had claims that were time-barred.  The Wyeth Special Transaction Severance Plan required employees to submit administrative claims for benefits within sixty days of the event triggering those claims.  Plaintiffs and the other proposed class members allege they were "involuntarily terminated" on April 1, 2010.  Only the three above-named plaintiffs submitted claims for benefits within sixty days of April 1, 2010.

[2]All evidence under consideration is found in the Administrative Record (paper no. 39) or in deposition testimony filed, with supporting affidavits, with the parties' pending motions.

granted and plaintiffs' motion will be denied.

## I.      BACKGROUND

Plaintiffs had been employees of Wyeth, a pharmaceutical company, for more than twenty years.[3] Plaintiffs were Wyeth employees, on the Wyeth payroll, and participants in Wyeth's employee benefit plans, but they provided services to Benchmark Federal Credit Union ("Benchmark"), a federally chartered credit union and separate legal entity from Wyeth owned and controlled by its members.  On January 14, 2009, Wyeth adopted a Special Transaction Severance Plan (the "Severance Plan"); if a Wyeth employee were terminated within twenty-four months of any "Change in Control" of the company, the Severance Plan provided that employee with certain severance benefits.[4]

On October 15, 2009, Pfizer, a publicly traded biopharmaceutical company, acquired Wyeth in a $68 billion cash and stock transaction, and plaintiffs became Pfizer employees. Plaintiffs, on the Pfizer payroll and participating in Pfizer's benefit programs, continued working on Benchmark matters.  Pfizer became the sponsor of the Severance Plan, with benefits paid by Pfizer.  Pfizer's acquisition of Wyeth began the twenty-four month period when a terminated employee would be entitled to Severance Plan benefits.[5]

The Severance Plan's stated purpose was to "provide certain employees . . . with benefits that will assist them with their transition during and following a Change in Control."  Under the Severance Plan, if an eligible participant experienced a termination of employment during the twenty-four month period following the change in control, for any reason other than retirement or good cause ("Involuntary Termination of Employment"), the employee was entitled to receive severance benefits.[6]  Benefits became available provided that a participant's employment was not

---

[3]  Plaintiff Feeko began working at Wyeth in 1982.  Plaintiff Marengo began working at Wyeth in 1983.  Plaintiff Rodgers began working at Wyeth in 1979, left the company in 1989, and returned in 1994.

[4]  Plaintiffs were participants in the Severance Plan as the term "participant" is defined in ERISA § 3(7), as amended, 29 U.S.C. § 1002(7).

[5]  According to the terms of the Plan, a "Change in Control" occurred when, among other things, "any person or persons acting in concert . . . becomes the beneficial owner of securities of the Company having at least 20% of the voting power of the Company's then outstanding securities."

[6]  Severance benefits included salary continuation benefits, certain welfare benefits, and the Rule of 70 benefits, as applicable.  Under the plan, salary continuation benefits were calculated by

transferred to a "successor company of the Company or (any of its affiliates) . . . ."  Sev. Plan §1.19.  The term "successor company" is not defined in the Severance Plan.  Any former Wyeth employee involuntarily terminated from her employment prior to October 15, 2011 (the date marking the end of the twenty-four month period following Pfizer's acquisition) was entitled to submit a claim for severance benefits.

On or about March 20, 2010, Pfizer employees who worked on Benchmark matters, including plaintiffs, participated in a teleconference call with Pfizer Human Resources representatives and Benchmark's CEO.  The employees were informed that, as of April 1, 2010, they would "transfer" to Benchmark and would no longer be Pfizer employees.  They were informed that this action would not make them eligible for benefits under the Severance Plan because they were being transferred, not terminated.  Employees were told this "transfer" would be governed by an Employee Continuity Agreement (the "Continuity Agreement") negotiated by Pfizer and Benchmark.  The Continuity Agreement, effective April 1, 2010, was not an amendment to the Severance Plan; it guaranteed continued employment at a rate of pay at least equal to the rate of pay earned at the time of the transfer for a period extending from the date of transfer to October 15, 2011, and provided for severance benefits for any employee involuntarily terminated from employment by Benchmark prior to October 15, 2011.

Pfizer employees who worked on Benchmark matters received memoranda requesting personnel information in "preparation for the process of setting up all personnel records and payroll for Benchmark . . ."  They were also required to complete an employment application and sign a form authorizing an investigation into all statements on the application "as may be necessary in arriving at an employment decision."

---

continuing the severed participant's salary for the longest period calculated by the following formula: 1) the sum of two-weeks for each year of eligible service plus one-week for each $10,000 in salary the participant earned at the time of termination (not to exceed 12 additional weeks); or 2) 26 weeks of salary (for employees who earned a salary less than $200,000); or 3) 52 weeks of salary (for employees who earned a salary of more than or equal to $200,000).  The number of weeks used to calculate the amount of salary continuation benefits for the applicable employee constituted such employee's applicable "Benefit Continuation Period."  The Rule of 70 benefit was an early retirement subsidy, available to those employees who met eligibility requirements and who had combined age and years of vesting service equal to or in excess of 70.  Plaintiffs, who began working for Wyeth/Pfizer between 1979 and 1983, respectively, all qualified for the Rule of 70 benefits.  Sev. Plan § 5.3(b).

On March 31, 2010, Pfizer employees who were assigned to work at Benchmark ceased working for Pfizer.  On April 1, 2010, those employees, including plaintiffs, officially became Benchmark employees.  Plaintiffs remained in the same offices, sat at the same desks, and performed the same tasks; however, they were paid directly by Benchmark, benefits were provided by Benchmark, and all employment personnel decisions were made by Benchmark. Plaintiffs were required to surrender their Pfizer identification badges, lost access to certain Pfizer facilities, no longer received pay-checks or medical benefits from Pfizer, no longer received employer contributions to their defined benefit pension plans from Pfizer, and were no longer able to receive Pfizer prescription medications at no-cost.

On or about April 13, 2010, plaintiffs received election notices regarding COBRA continuation coverage stating that plaintiffs' health care benefits "ended on March 31, 2010 as a result of [their] termination of employment."  Plaintiffs believed this change in employment amounted to an involuntary termination; defendants maintained that Benchmark employees had their employment transferred from Pfizer to Benchmark pursuant to the Continuity Agreement and that no termination had occurred.

In late May 2010, plaintiffs filed claims with Pfizer's Coordinating Office for benefits under Section 2.2 of the Severance Plan (the Coordinating Office was the Plan Administrator entity empowered to review initial claims).  Plaintiffs, arguing they were no longer employees of Pfizer or one of its affiliates, requested severance benefits because they had been involuntarily terminated within twenty-four months of Pfizer's acquisition of Wyeth.  On or about August 27, 2010, the Coordinating Office denied plaintiffs' claims because, "[T]heir employment was transferred to Benchmark, which is a 'successor employer' and a 'successor to Pfizer with respect to the outsourcing of its credit union work.'"  According to the Claim Denial Letters, plaintiffs did not meet the eligibility criteria set forth in the Severance Plan for three reasons: (1) plaintiffs had been transferred to a "successor employer"; (2) plaintiffs had not experienced an employment loss; and (3) plaintiffs had not experienced a reduction in the base rate of pay or had their principal place of business changed.

In October 2010, plaintiffs appealed the denials of their benefit claims to Pfizer's Administrative Committee, the entity empowered to review and decide benefit claim appeals. All three plaintiffs argued that they had been terminated by Pfizer and hired by Benchmark,

rather than transferred, because: (1) they were required to complete an employment application; (2) Benchmark was not an affiliate or successor company of Pfizer; (3) the letter denying their claims was based on a misreading of the Severance Plan; and (4) being newly employed by Benchmark did not disqualify them for severance benefits.

On or about December 16, 2010, the Administrative Committee denied plaintiffs' appeals in writing for substantially the same reasons the Coordinating Office gave in the original Claim Denial Letters.  The Committee also noted, "this interpretation of the Plan is consistent with Wyeth's past practices…where Wyeth denied severance to employees transferred to another entity as a result of a sale if, like here, the entity to which employees were transferred provided services back to Wyeth."  Plaintiffs were informed that the Committee's decision was final and that they had the right to challenge the adverse determination by bringing civil actions under ERISA, § 502(a).

Plaintiffs, alleging Benchmark is not a successor company of Wyeth or Pfizer, contend the Administrative Committee abused its discretion in denying their claims for severance benefits by failing to determine eligibility according to the provisions of the Severance Plan and by failing to construe its terms in good faith.  The issue is whether the plaintiffs' discontinuation of Pfizer employment on March 31, 2010, entitled plaintiffs to severance benefits.

## II.    DISCUSSION

Summary judgment is appropriate if there is no genuine dispute of material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(a).  A fact is "material" if proof of its existence might affect the outcome of the litigation, and a dispute is "genuine" if the evidence is such that a reasonable jury could return a verdict for the nonmoving party.  *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

The court views the facts in the light most favorable to the nonmoving party.  After making all reasonable inferences in the nonmoving party's favor, there is a genuine issue of material fact if a reasonable jury could find for the nonmoving party.  *Pignataro v. Port Auth.*, 593 F.3d 265, 268 (3d Cir. 2010).  While the moving party bears the initial burden of showing the absence of a genuine issue of material fact, meeting this obligation shifts the burden to the

nonmoving party who must set forth specific facts showing that there is a genuine issue for trial. *Anderson*, 477 U.S. at 250.

The rules governing summary judgment are identical when addressing cross-motions for summary judgment. See *Lawrence v. City of Phila.*, 527 F.3d 299, 310 (3d Cir. 2008). Cross-motions are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified. *Rains v. Cascade Indus., Inc.*, 402 F.2d 241, 245 (3d Cir. 1968). The court must rule on each party's motion on an individual and separate basis and determine whether a judgment may be entered. *Schlegel v. Life Ins. Co. of N. Am.*, 269 F.Supp.2d 612, 615 n.1 (E.D. Pa. 2003).

A.    **ERISA Standard of Review**

ERISA provides that a plan participant may bring a civil action to recover benefits under the terms of a plan, to enforce rights under the terms of a plan, or to clarify rights to future benefits under the terms of a plan. 29 U.S.C. §1132(a)(1)(B). Principles of trust law require courts to review a denial of benefits challenged under §1132(a)(1)(B) under a *de novo* standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or construe the terms of the plan. See *Howley v. Mellon Financial Corp.*, 625 F.3d 788, 792 (3d Cir. 2010). Section 2.2 of the Severance Plan provides that the "Plan Administrator shall have full discretion to determine eligibility to receive benefits under this Plan." Where the administrator has discretionary authority, a court applies a deferential "abuse of discretion" standard, essentially equivalent to an "arbitrary and capricious" standard. *Abnathya v. HoffmannLa Roche Inc.*, 2 F.3d 40, 45 n.4 (3d Cir. 1993). A court may overturn a decision of the plan administrator only if it is "without reason, unsupported by substantial evidence or erroneous as a matter of law." *Id.*

The Supreme Court has disapproved use of a specific list of factors courts must always consider. See *Metro. Life Ins. Co. v. Glenn*, 554 U.S. 105, 119 (2008). *Glenn* recognized that benefit determinations arise in different contexts and circumstances and the factors considered will be varied and case-specific. *Id.* at 117. In *Glenn*, the factors included procedural concerns about the administrator's decision-making process and structural concerns about a conflict of interest inherent in the plan's funding. A court should "take account of several different

6

considerations of which a conflict of interest is one," and reach a result by weighing them all.
*Id*.

> **B.     Procedural Irregularities**

Plaintiffs argue there were "myriad" procedural irregularities in the Committee's denial of plaintiffs' appeals for benefits.  Meeting minutes kept by the Committee incorrectly state "Wyeth's on-site credit union" was "sold to [Benchmark]" and plaintiffs' employment was "transferred to Benchmark as part of the sale."  There was no evidence of a sale to Benchmark. Meeting minutes also state the Committee based its denial of plaintiffs' appeals, in part, on its interpretations of the terms "successor employer" and "same desk rule."[7]  These terms do not appear in the Severance Plan.  It refers, in relevant part, not to a "successor employer" but to a "successor company of the Company," although the Severance Plan does not define this term.

Plaintiffs also argue that defendants' consideration of prior claim decisions by Wyeth administrators, under different Wyeth severance plans, was improper.  The Committee did point to past Wyeth practices and stated its decision was "reasonable" and "consistent" with those practices.  There is nothing in the Severance Plan that specifically calls for, or forbids, consideration of past administrative decisions.

Defendants acknowledge the Committee's meeting minutes may contain drafting errors but argue such errors do not rise to procedural irregularities.  According to defendants, the Committee members did not mistakenly believe that a "sale" to Benchmark had taken place, and they did not interpret the Severance Plan differently because they used the term "successor employer," rather than "successor company of the Company," in reviewing plaintiffs' appeals.

Although defendants referred to terms not in the Severance Plan and considered benefit decisions related to different severance plans, there were no actionable procedural irregularities in the Committee's review and denial of plaintiffs' appeals.  There is no allegation that the Committee failed to provide proper notice or reversed a claim decision without explanation or disregarded past decisions on which it had previously relied.  It is appropriate for a plan administrator to consider historical benefit decisions when considering similar benefit claims.

---

[7]This "rule," used by courts in interpreting the applicability of certain ERISA provisions, states that an employee who performs the same services at the same desk both before and after a merger or acquisition has not actually experienced a change in employment.  See *Hein v. FDIC*, 88 F.3d 210, 214 (3d Cir. 1996).

See *Howley*, 625 F.3d at 795.  Plaintiffs argue the Committee considered decisions unrelated to plaintiffs' appeals, but the Committee claims it referred to Wyeth decisions to familiarize itself with Wyeth's past practices.  Pfizer had acquired Wyeth just over a year before the Committee reviewed plaintiffs' appeals; the Committee's use of Wyeth examples for guidance does not reflect a self-serving or selective use of irrelevant evidence and does not appear to have significantly influenced the Committee's decision.  These alleged irregularities or errors in the Committee's procedures do not suggest the Committee's decision was without reason, unsupported by substantial evidence or erroneous as a matter of law.

> ### C.    Structural Concerns

Plaintiffs also argue the Committee operated under an inherent structural and financial conflict of interest, and the bias of its members necessarily influenced its decision.  *Glenn* requires a court to consider conflict of interest as a factor in its analysis and to afford it greater importance where there is a likelihood that it affected the denial of benefits.  *Howley*, 625 F.3d at 794 (citing *Glenn*, 554 U.S. at 117).  An "inherent" conflict of interest exists where a plan administrator both determines whether an employee is eligible for benefits and pays those benefits out of its own pocket.  *Sivalingam v. Unum Life Ins. Co. of Am.*, No. 09-4702, 2011 U.S. Dist. LEXIS 45660 at *9-10 (E.D. Pa. Apr. 26, 2011); see *Glenn*, 554 U.S. at 108.  Plaintiffs argue such an inherent conflict existed here.  Any payments made under the Severance Plan would be paid by Pfizer.

The Committee's five members were senior-level employees appointed by Pfizer's Senior Vice President of Human Resources.  No one below the level of "Senior Director" could qualify for appointment.  Three of the five members were personally involved in negotiating the terms of the Pfizer-Benchmark transaction, including the Continuity Agreement; it formed the basis for Pfizer's argument that plaintiffs and similar employees were "transferred" to Benchmark, not terminated, and were not eligible for benefits under the Severance Plan.  Pfizer Human Resources representatives referred to the Continuity Agreement in the March 20, 2010, conference call when they stated that employees working on Benchmark matters were not eligible for Severance Plan benefits.  Plaintiffs argue these Committee members had already decided the issue before plaintiffs filed their claims for benefits.  Committee meeting minutes reveal that these three members disclosed their roles in the Benchmark decision but decided

against recusal because they were acting as Pfizer employees at the time, not as fiduciaries to the Severance Plan.

In weighing the significance of a potential conflict of interest, a court may consider whether any steps were taken to reduce potential bias and promote accuracy, for example, by walling off claim administrators from those interested in firm finances, or by imposing management checks penalizing inaccurate decision-making irrespective of whom the inaccuracy favors. *Glenn*, 554 U.S. at 112-117. The Committee and its members took no such steps beyond the initial disclosure of the three members' roles in negotiating the Benchmark transaction giving rise to plaintiffs' claims for benefits. Each of the Committee members held high-ranking Pfizer executive positions, with vested interests in Pfizer's financial performance; plaintiffs' claims for benefits involve a minuscule fraction of the revenue generated by a multinational, multi-billion dollar company, but the Committee members' interest in the company's financial well-being stood in direct conflict with plaintiffs' interests in their severance benefits.

Beyond the financial conflict of interest, a majority of Committee members operated under a personal conflict of interest in denying plaintiffs' claims for benefits. The three members who helped negotiate the Continuity Agreement had significant incentive to have their interpretation of the Severance Plan upheld. These members had participated in drafting contract language that moved plaintiffs from Pfizer's payroll without exposing Pfizer to financial liability for severance benefits. Plaintiffs appealed the denials of their administrative claims for benefits in October 2010, six months after becoming Benchmark employees under the Continuity Agreement. In reviewing plaintiffs' appeals, those Committee members partially responsible for the Continuity Agreement would have been influenced to reach the same conclusion they reached six months earlier. Those members might seek to avoid contradicting their own interpretations so quickly; they would have significant reason to avoid subjecting Pfizer to liability for severance benefits when they had participated in drafting or approving language they believed precluded such liability.

Defendants argue the Committee members were capable of wearing "two hats" and understood their roles as Severance Plan fiduciaries were distinct from that of Pfizer employees, but these inherent conflicts of interest, while not determinative, weigh in plaintiffs' favor.

D.      "Plain language" of the Plan

9

In assessing whether benefits are due, the language of the Severance Plan itself is paramount.  The court is guided by general principles of contract interpretation and construction. Whether a plan's language is ambiguous is a legal question reviewed *de novo*.  See *Bill Gray Enters. Inc. Employee Health and Welfare Plan v. Gourley*, 248 F.3d 206, 218 (3d Cir. 2001).  If a plan's terms are unambiguous, the court must give effect to their meaning.  Any actions taken that are inconsistent with the unambiguous terms of a plan document are inherently arbitrary. *Roberts v. Indep. Blue Cross*, No. 03-cv-1739, 20005 U.S. Dist. LEXIS 1366, at *12 (E.D. Pa. Jan. 28, 2005).  If a plan's terms are ambiguous, i.e., there is reasonable support for more than one interpretation, the underlying administrative decision must be affirmed so long as it was based on *a* reasonable interpretation of the plan.  *McElroy v. SmithKline Beecham Health & Welfare Benefits Trust Plan*, 340 F.3d 139, 143 (3d Cir. 2003) (when a plan's language is ambiguous and the administrator is authorized to interpret it, courts "must defer to this interpretation unless it is arbitrary or capricious"); see *DeWitt v. Penn-Del Directory Corp.*, 106 F.3d 514, 520 (3d Cir. 1997) ("we must uphold a plan interpretation even if we disagree with it, so long as the administrator's interpretation is rationally related to a valid plan purpose and is not contrary to the plain language of the plan").

Section 2.1 of the Severance Plan provides severance benefits for an employee who, within the twenty-four month "Change in Control" period, experiences an "Involuntary Termination of Employment" or resigns for "Good Reason."  Section 1.11 defines "Involuntary Termination of Employment" as a termination of employment by the Company, other than a termination for cause.  Section 1.19 defines "Termination of Employment" as termination of active employment with the Company for any reason other than retirement, death or disability, "provided that a transfer of employment to any successor company of the Company or (any of its affiliates) shall not be a Termination of Employment . . ."

The parties' disagreement is narrowly focused on the meaning of the term "successor company of the Company or (any of its affiliates)," which is not defined.  Benchmark did not succeed to all or substantially all of Pfizer's assets nor did it otherwise acquire any business of Pfizer.  The Employment Continuity Agreement negotiated by Pfizer and Benchmark guaranteed plaintiffs would be "re-hired" but plaintiffs argue this has no bearing on whether plaintiffs were terminated or whether Benchmark qualifies as a "successor company" of Pfizer.

10

The Severance Plan term "successor company of the Company" does not have only one reasonable, unambiguous interpretation. When "successor" is undefined in a plan document, as here, it is considered an ambiguous term. *Taylor v. Continental Group Change in Control Severance Pay Plan*, 933 F.2d 1227 (3d Cir. 1991) (in *Taylor*, the plan at issue was reviewed *de novo* but here the ERISA plan granted plan administrators the discretionary authority to determine eligibility for benefits.) The court must defer to defendants' interpretation unless it is arbitrary or capricious. Having determined that "successor company of the Company or (any of its affiliates)" is an ambiguous provision, the remaining issue is the reasonableness of the Severance Plan administrator's interpretation.

The stated "Purpose of the Plan" is to "provide certain employees . . . with benefits that will assist them with their transition during and following a Change in Control." Pfizer's October 2009 acquisition of Wyeth constituted a Change in Control under the Severance Plan that began the twenty-four month period when an involuntarily terminated employee would receive severance benefits. The Severance Plan was designed to protect Wyeth employees if a future employer assuming control over Wyeth personnel took action adverse to former Wyeth employees. The Severance Plan was not the result of bargaining between Wyeth and its employees. Severance plans like this are essentially unilateral contracts; it is difficult to identify the true intentions of the parties. Only three of possible forty-two members of the purported class filed claims for severance benefits; this suggests many Pfizer employees working on Benchmark matters did not believe there was a termination creating eligibility for benefits.

Benchmark was required to accept plaintiffs as employees pursuant to the Continuity Agreement. While not an amendment to the Severance Plan, the Continuity Agreement may be considered in deciding whether plaintiffs were involuntarily terminated. The Administrative Committee concluded that plaintiffs had been transferred to Benchmark, and Benchmark qualified as a successor company of Pfizer with respect to the provision of credit union services. A new employer may be a "successor" for some purposes and not for others. *Howard Johnson Co. v. Detroit Local Joint Executive Bd.*, 417 U.S. 249, 263 n.9 (1974). The term "successor" should be given the meaning intended by the Severance Plan drafters and reasonably understood by its beneficiaries; this interpretation of its terms was reasonably understood by almost all of the purported class members.

11

Plaintiffs' arguments to the contrary are not persuasive.  Plaintiffs did have to complete employment application forms and were given notices regarding COBRA coverage as a result of "termination of employment" but, in light of the Continuity Agreement, this paperwork appears to have been a formality.  Plaintiffs' employment circumstances did change somewhat, but they continued to perform the same tasks at the same desks with the same base rate of pay.  The Continuity Agreement provided plaintiffs with the same severance benefits package offered under the Severance Plan, with the same requirements for eligibility, in the event Benchmark chose to terminate plaintiffs or similarly situated employees after April 1, 2010 (when Benchmark assumed control over personnel decisions).  This severance package was available to plaintiffs as Benchmark employees until October 15, 2011, the same time covered by the Severance Plan.  If plaintiffs were terminated without cause by Benchmark, the benefits available under the Continuity Agreement would be based on their total service time (dating back to start of employment with Wyeth), not just time with the transferee entity (Benchmark).

It was not unreasonable for defendants to interpret Severance Plan terms to include Benchmark as a "successor company" of Pfizer; the alternative interpretation would have guaranteed plaintiffs a windfall unavailable to other Pfizer employees covered by the Severance Plan.  Under plaintiffs' preferred interpretation, plaintiffs would work at the same desks with the same base rate of pay while receiving Severance Plan benefits from Pfizer; if plaintiffs were terminated without cause by Benchmark before October 15, 2011, plaintiffs would, in addition to the benefits paid by Pfizer, also receive benefits under the Continuity Agreement.  They would receive duplicate benefits.  This is an alternative interpretation, but that does not mean the Committee's interpretation was arbitrary and capricious.  Severance Plan benefits were designed to assist employees "with their transition during and following a Change in Control." Considering the *de minimis* changes in plaintiffs' employment status after Pfizer's acquisition of Wyeth and after plaintiffs became Benchmark employees, defendants' interpretation was reasonable and did not contradict the Severance Plan's purpose.

### III.     CONCLUSION

Regarding plaintiffs' Motion for Summary Judgment, the court considers the facts in the light most favorable to the defendants and makes all reasonable inferences in defendants' favor.

After doing so, the Committee's structural conflicts of interest are troubling and require the court to view the Committee's decision carefully.  However, given the court's deference to the Committee's reasonable interpretation of ambiguous Severance Plan terms and the lack of procedural irregularities, the structural conflicts of interest do not constitute an abuse of discretion as a matter of law.

Regarding defendants' Motion for Judgment on the Administrative Record, the court considers the facts in the light most favorable to plaintiffs and makes all reasonable inferences in plaintiffs' favor.  After doing so, the Committee's structural conflicts of interest remain troubling but not determinative.  The decision not to reward three employees uniquely does not constitute an abuse of discretion as a matter of law.

The court will uphold the Severance Plan administrator's decision denying plaintiffs benefits.  The court's role is not to agree or disagree with the plan administrator's decision but to determine whether the denial of plan benefits was without reason, unsupported by substantial evidence or erroneous as a matter of law.  The court will grant defendants' Motion for Judgment on the Administrative Record (paper no. 40) and will deny plaintiffs' Motion for Summary Judgment (paper no. 41).  An appropriate Order follows.